FILED

**UNITED STATES DISTRICT COURT** P 1: 48
**DISTRICT OF RHODE ISLAND**

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MARVIN GORDON, On Behalf of Himself and All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | **INDIVIDUAL CLAIM FOR VIOLATION OF SECTION 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND CLASS REPRESENTATION COMPLAINT FOR BREACH OF FIDUCIARY DUTY** |
| v. ) | |
| COSTA, INC., DAVID G. WHALEN, RUSSELL A. BOSS, BERNARD A. BUONANNO, JR., JACOB C. GAFFEY, DWAIN L. HAHS, HARLEN M. KENT, ANDREW J. PARSONS, FRANCES P. PHILIP, ESSILOR INTERNATIONAL, S.A., and GWH ACQUISITION SUB, INC., ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | CA 13- 786 L |
| ) | Case Number _____ |

---

## CLASS ACTION COMPLAINT

Plaintiff Marvin Gordon ("Plaintiff"), on behalf of himself and all others similarly situated, by his attorneys, alleges the following upon information and belief, except as to those allegations pertaining to Plaintiff which are alleged upon personal knowledge:

## INTRODUCTION

1.      Plaintiff brings this action individually, and on behalf of the holders of the common stock of Costa, Inc. ("Costa" or the "Company") against the board of directors of Costa (the "Board" or the "Individual Defendants") and other persons and entities (collectively, "Defendants") involved in a proposed transaction in which Essilor International, S.A. ("Essilor"), through its wholly-owned subsidiary GWH Acquisition Sub ("Merger Sub"), will

acquire all of the outstanding stock of Costa for inadequate consideration (the "Proposed Transaction").

2.      Based in Lincoln, Rhode Island, Costa owns and manages the Costa and Native Eyewear brands.  Known best for its premium sport sunglasses tailored to sports enthusiasts who are on the water, the Costa Brand is rapidly expanding into prescription sunglasses and sports apparel.  It sells sunglass products through its employee representatives and manufacturers' agents to approximately 7,600 retail accounts, including optical and sunglass specialty shops, department stores, and sporting goods retailers in the United States.  The Company also sells apparel and accessory products, such as hats, T-shirts, cords, cases, and backpacks.  The Company was formerly known as A.T. Cross Company and changed its name recently to "Costa Inc." in September 2013.

3.      On November 8, 2013, Costa issued a press release announcing that it had entered into a definitive Agreement and Plan of Merger on November 7, 2013 (the "Merger Agreement") for Essilor to acquire Costa in a deal with a total enterprise value of approximately $270 million. Under the terms of the Proposed Transaction, Costa common shareholders will receive $21.50 per share in cash for each Costa share they own.  The Proposed Transaction is expected to be completed in early 2014.  Upon completion of the Proposed Transaction, Costa will become a wholly-owned subsidiary of Essilor.

4.      The Proposed Transaction per share price of $21.50 drastically undervalues the Company's prospects and is the result of an entirely unfair sales process.  In fact, Costa shareholders will only collect a paltry 7% premium on the prior day's closing price.  Indeed, in just the previous year, the Company's stock price has increased by an astronomical 135%.

2

5.    Since the announcement of the Proposed Transaction, the Company's share price has been consistently trading above the $21.50 consideration.  As recently as December 10, 2013, the Company's shares traded as high as $22.00 per share, 2.32% higher than the value that shareholders are expected to receive from the Proposed Transaction.

6.    Remarkably, according to *Yahoo! Finance*, Costa's own financial advisor, D.A. Davidson & Co. ("Davidson") has set a price target for Costa stock at $29.00 per share, the same advisor that also opined to the Board that $21.50 was a fair price.

7.    Costa is flush with cash, lowering the true premium of the Proposed Transaction to below the previous closing price. Moreover, the Proposed Transaction appears purposely timed to forestall a surge in the Company's share price, as it was announced just days after the Company released its glowing third quarter 2013 results: Costa announced that its sales had increased 26.3% for the quarter, and 20.7% for the nine months ending September 2013.

8.    Compounding the failure to provide adequate consideration, Defendants also agreed to unreasonable deal-protection devices that unfairly favor Essilor and discourage potential bidders from submitting a superior bid for the Company, effectively rendering the Proposed Transaction a *fait accompli*.  These devices include (i) a non-solicitation or "no-shop" provision that prohibits the Company from seeking superior bids; (ii) a strict "standstill" provision prohibiting, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative business combinations; (iii) a provision that prohibits the Board from entering into discussions and negotiations with respect to a potential "Superior Proposal" unless the Board first gives Essilor four business days' notice of any determination to take any such action; and (iv) a termination fee of $8.9 million.

9.      Similarly, in an attempt to induce shareholder approval of the unfair Proposed Transaction, Defendants caused to be filed with the Securities and Exchange Commission ("SEC") an inadequate and misleading preliminary proxy statement Schedule 14A (the "Proxy") on December 9, 2013 in advance of an anticipated shareholder vote by Costa shareholders.

10.     As alleged in further detail below, both the value to Costa's shareholders contemplated in the Proposed Transaction and the process by which Defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other public shareholders of the Company.

11.     The Individual Defendants' conduct constitutes a breach of their fiduciary duties owed to Costa's public shareholders, and a violation of applicable legal standards governing the Individual Defendants' conduct.

12.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of their fiduciary duties of loyalty, good faith and due care.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C §1331 in that Plaintiff's claims arise in part under the Constitution and laws of the United States, including the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the Defendants, including Costa, either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this

complaint occurred in substantial part in this District.  Finally, the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

15.    Plaintiff currently holds shares of common stock of Costa and has held such shares at all relevant times.

16.    Defendant Costa is a Rhode Island corporation with its principal executive offices located at 24 Albion Road, Suite 330, Lincoln, RI 02865.  Costa, formerly A. T. Cross Company, incorporated on March 29, 1916, is a designer and marketer of branded personal accessories, including writing instruments, reading glasses, personal and business accessories and sunglasses. The Company's Cross Optical Group (COG) consists of its wholly owned subsidiary, Cross Optical Group, Inc. and is the legal entity of the Company's two sunglass brands: Costa and Native.  The Company's COG designs, manufactures and markets polarized sunglasses under the brand names Costa and Native. The Company's brands offer sunglasses in more than 75 styles and 25 lens options.  Costa common stock is listed and traded on the NASDAQ Stock Exchange under the ticker symbol "ATX."

17.    Defendant Whalen ("Whalen") has been the President, Chief Executive Officer, and a director of the Company since 1999.

18.    Defendant Russell A. Boss ("Boss") has been a director of the Company since 1962.

19.    Defendant Bernard V. Buonanno, Jr. ("Buonanno") has been a director of the Company since 1986.

20.     Defendant Jacob C. Gaffey ("Gaffey") has been a director of the Company since 2011.

21.     Defendant Dwain L. Hahs ("Hahs") has been a director of the Company since 2010.

22.     Defendant Harlan M. Kent ("Kent") has been a director of the Company since 2008.

23.     Defendant Andrew J. Parsons ("Parsons") has been a director of the Company since 2001.

24.     Defendant Frances P. Philip ("Philip") has been a director of the Company since 2011.

25.     Defendant Essilor is a French corporation with its headquarters located in Charenton-le-Pont, France. Essilor produces ophthalmic lenses along with ophthalmic optical equipment. Essilor's stock is listed and traded on the Euronext Paris Stock Exchange under the symbol "EI."

26.     Defendant Merger Sub is a Rhode Island corporation wholly- owned by Essilor that was created for the purposes of effectuating the Proposed Transaction.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES UNDER STATE LAW

27.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other shareholders of Costa and owe Plaintiff and the other members of the Class (defined herein) the duties of good faith, fair dealing, loyalty and full and candid disclosure.

28.     By virtue of their positions as directors and/or officers of Costa, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Costa to engage in the practices complained of herein.

29.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.   In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to obtain adequate value for shareholders and its constituents rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the shareholders to make an informed voting decision.   To diligently comply with this duty, the directors of a corporation may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)     discourages or inhibits alternative offers to purchase control of the corporation or its assets;

(d)     will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

30.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff and the other

shareholders of Costa, including their duties of loyalty, good faith and independence, insofar as they, *inter alia*, engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff or the other shareholders of Costa common stock. ·

### CLASS ACTION ALLEGATIONS

31.     Plaintiff brings the state law claims in Counts III and IV pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and as a class action, on behalf of all holders of Costa common stock who are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

32.     This action is properly maintainable as a class action because:

A.     The Class is so numerous that joinder of all members is impracticable. As of October 26, 2013, there were 11,388,835 shares of Costa Class A common stock issued and outstanding and 1,804,800 shares of Costa Class B common stock issued and outstanding. The actual number of public shareholders of Costa will be ascertained through discovery;

B.     There are questions of law and fact which are common to the Class, including *inter alia,* the following:

C.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

(i)     whether the Individual Defendants aided and abetted by Essilor, have breached their fiduciary duties of undivided loyalty, independence or due care with

8

respect to plaintiff and the other members of the Class in connection with the Proposed Transaction;

(ii) whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(iii) whether the Individual Defendants have disclosed all material information regarding the Proposed Transaction; and

(iv) whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction complained of herein consummated.

D.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

E.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

F.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

G.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

9

## SUBSTANTIVE ALLEGATIONS

A.    **Background of the Company and its Recent Performance**

33.    Based in Lincoln, Rhode Island, Costa owns and manages the Costa and Native Eyewear brands.  Known best for its premium sport sunglasses tailored to sports enthusiasts who on the water, the Costa Brand is rapidly expanding into prescription sunglasses and sports apparel.  The Company also sells apparel and accessory products, such as hats, T-shirts, cords, cases, and backpacks.  It sells sunglass products through its employee representatives and manufacturers' agents to approximately 7,600 retail accounts, including optical and sunglass specialty shops, department stores, and sporting goods retailers in the United States.  The Company was formerly known as A.T. Cross Company and changed its name recently to "Costa Inc." in September 2013.

34.    Following the decision to streamline its business and focus on the eyewear market, the Company is well-positioned to continue its growth trend, particularly, as its sunglasses business has continually developed and earned a profit over the past two years, whereas its writing instrument business saw lower revenues and negative operating incomes over that same period.

35.    During the 2012 fiscal year, the Company's sunglasses business had over $83 million in sales, an increase of 14.9% from 2011.  In contrast, the Company's writing instrument business sales fell 4.8% from 2011 to 2012.  During 2012, the Company also saw its sunglasses business have an operating income of $13.4 million, an increase of approximately 24% from 2011, whereas its writing instrument division lost approximately $171,000.

36.    This split between the Company's sunglasses and writing instrument business continued through the first three quarters of 2013.  For the quarter ended March 30, 2013, the

Company's sunglasses business saw an increase in sales of 19.1% from the same quarter in 2012, with a positive operating income of approximately $3.7 million. In contrast, the Company's writing instrument business had a decrease in sales of 6.2% from the same quarter in 2012, and had a negative operating income of $1.1 million.

37.     The divergent paths continued through the quarter ended June 29, 2013. During this quarter the Company's sunglasses business saw an increase in sales of 17.9% from the same quarter in 2012, with a positive operating income of approximately $7.2 million. Indeed, the performance of the Company's sunglasses business was such that Defendant Whalen stated that it "delivered a record performance demonstrating that the strategies we have put in place to build our sunglass business are working." However, as the sunglasses business continued to grow, the writing instrument business continued to constrict, seeing a decrease in sales of 1.1% from the same quarter in 2012, with a negative operating income of approximately $2.4 million.

38.     The Company, recognizing that the writing instrument business was a drag on its finances, entered an agreement to sell the business on July 15, 2013, for $60 million in cash, closing the sale on September 6, 2013. At the time of the sale's closing, the writing instrument business had a negative operating income of approximately $395,000 for the third quarter ended September 28, 2013, excluding $2.9 million in losses related to the sale. The writing instrument business also only had sales of approximately $12.4 million, whereas it had sales of approximately $24 million in the same quarter in 2012. In contrast to the poor performance of this division, the Company's sunglasses business continued its success through the quarter, with a positive operating income and an increase in sales of 26.3% from the same quarter in 2012 and 20.7% for the nine months ending September 2013. Non-GAAP pro forma earnings per share from continuing operations increased 29% and 25% for the three and nine months ending

September 28, 2013, respectively.   The Company also reported cash and cash equivalents of

$63,876.

39.      In commenting on Costa's third quarter results, Whalen, Costa's CEO, stated the

following:

> We are certainly pleased with our third quarter and year to date performance. Our
> sunglass business has momentum as it enters the fourth quarter as all of the Costa
> brand's revenue sources; including prescription and non-prescription sunglasses,
> as well as apparel and accessories are performing very well. As we move through
> the last quarter of this year and head into 2014, our confidence in our business
> model and its growth potential is high. Every day, our authentic brands and
> products are attracting new consumers in both existing markets as well as new
> ones.

40.      Despite Costa's strong performance and improved earnings over the past year, the

Company's Board has now determined to sell the Company at a price below its intrinsic value to

the detriment of Costa's common stock holders.

**B.      The Proposed Transaction is the Product of a Flawed Process that Provides Unique
Material Benefits to Certain Costa Directors and Officer Not Available to the
Company's Public Shareholders**

41.      Rather than negotiate a transaction that was in the best interest of Costa's

shareholders, the Board and conflicted executive management disloyally put their own financial

interests ahead of the Company's shareholders' and steered a transaction towards their desired

acquirer, Essilor, in breach of their fiduciary duty to maximize shareholder value.

42.      After announcing that the Company was looking to shed its Cross Accessory

Division ("CAD") in early 2013, the Company began fielding inquiries regarding the availability

of the Cross Optical Group ("COG") division, which included the Costa and Native eyewear

brands.  In fact, the Chairman of Company A[1] reached out directly to Defendant Whalen and

---

[1] The identities of potential acquirers of Costa are not publicly available via the Company's Proxy.  For the purposes
of this Complaint, the Plaintiff will identify these companies by the moniker assigned in the Proxy, that being

indicated that it would be interested in exploring a purchase for all of A.T. Cross (including both CAD and COG). The advance was rebuffed by the Board in late February 2013, who instructed Company A to not even provide a written expression of interest as they believed a sale of the two divisions together was unattractive.

43. The Board, however, took a different approach a few short weeks later in March 2013, when Essilor, through a representative, approached Defendant Buonanno and informed him of Essilor's interest in the Company's Costa brand. Armed with this knowledge and a newfound willingness to discuss selling the COG division that they did not have just one month prior when Company A inquired, Defendant Boss instructed Defendant Whalen to continue conversations with Essilor to flesh out their interest.

44. Throughout April, Defendant Whalen had various conversations with senior management of Essilor about their potential acquisition of COG following a divestiture of CAD. A representative from Essilor even went so far as to acknowledge that any potential offer would need to be favorable relative to other recent transactions in the sunglass industry.

45. On May 20, 2013, Essilor executed a confidentiality/standstill agreement with the Company, serving as the catalyst for two separate meetings between the Company and Essilor that took place in late May 2013.

46. Also in May 2013, the President of a division of Company B reiterated a conversation that a representative of the company had with COG management regarding the company's interest in a potential acquisition of COG. The two sides set up a call to speak about Company B's interest, but, according to Costa in their Proxy statement, the representative from Company B cancelled and never re-scheduled the call. Interestingly enough, according to the

---

"Company [Letter]".

Proxy statement, Company B inquired about whether the Company would have an interest in selling COG after it had announced the sale of CAD, and Costa sent a confidentiality agreement to Company B on September 20, 2013, who subsequently engaged in due diligence.  As evidenced by the Proxy, the Company was in no obvious hurry to engage in earnest discussions with Company B so long as its desired acquirer, Essilor, was still willing and participating in talks.

47.     Much of June 2013 was spent by the Company meeting with Essilor senior management and providing certain COG projections.  Essilor also provided its initial valuations of COG, first at $225 million and then at $240 million.

48.     In late June 2013, Company C, through its managing director, contacted the Company and inquired whether it was interested in selling COG.  Unlike discussions with Essilor, which moved rapidly from the get-go, talks with Company C were generally stalled until September 20, 2013, when Defendant Whalen spoke with a representative from the Company who reiterated its interest in purchasing the entirety of Costa.  Talks with Company C terminated on September 24, 2013 after they indicated they would not be able to absorb the liabilities retained by Costa from the CAD transaction, among other reasons, and thus would not be willing to pay a price in the valuation range that Defendant Whalen indicated would be necessary by an acquirer of the Company.

49.     On July 24, 2013, nearly five full months following Essilor's initial overtures regarding the acquisition of COG, the Costa Board of Directors finally met with an investment banking firm (who was not retained) to discuss their potential engagement.  It was also at this meeting that a Special Committee, composed of Defendants Parsons, Hahs and Gaffey and charged with supervising the negotiations with Essilor, was created.

50.     The lack of guidance from an investment banking firm did not curb the Board's fervor to negotiate with Essilor, however, as Defendant Whalen informed Essilor on July 25, 2013 that the Board had made closing the CAD sale a top priority and authorized him to provide Essilor with certain due diligence information and data, including revised COG financial projections.  Essilor jumped at this opportunity, making due diligence requests from August 1, 2013 until August 21, 2013, which were responded to in kind by Company employees.

51.     On August 13, 2013, after months of discussions with Essilor and nearly two weeks of responding to their due diligence requests, the Company Board authorized management to retain D.A. Davidson ("Davidson") as its investment bank for the sale of COG.  The formal engagement and memorialization of this relationship, however, did not occur until September 24, 2013, *after* Davidson had discussions with Company D regarding the Company and after contacting four other potentially interested parties.  Notably, Davidson did not contact a major industry participant based solely on an indication that company had made to C.W. Downer, the investment banking firm hired by the Company in regards to its CAD divestiture, months earlier. Unfortunately, this half-hearted approach to shopping the valuable Costa was the modus operandi for Davidson, who were simply seeking to provide window dressing for Defendant Whalen and the Board's desired acquisition by Essilor, particularly in light of Essilor's September 20, 2013 written preliminary indication of interest whereby Essilor would acquire all of the outstanding common stock of Costa for $21.00 per share, a mere 6% premium over the Company's share price high of $19.69 on September 19, 2013.

52.     On October 16, 2013, after posturing from both sides, Essilor submitted a revised indication of interest letter to Costa, indicating a price per share of $21.50, but also including an exclusivity and confidentiality provision that was binding on both parties.  On the same day,

Company B indicated that it, too, was still interested in a potential acquisition of Costa, but that it was not in a position to make a definitive decision on an offer at the time; an understandable stance as they only received access to the Costa virtual data room on October 9, 2013, whereas Essilor had the benefit of nearly two and a half months of due diligence prior to submitting its revised bid.

53.      On October 18, 2013, following the October 16, 2013 recommendation of the Special Committee, the Board approved Costa's execution of the letter agreement with Essilor; agreeing to a price per share of $21.50, a minimum cash closing condition, and a period of exclusivity until October 31, 2013.   On this day, Company B's access to the data room was revoked and all communications ended with it, by virtue of the exclusivity agreement; effectively eliminating any semblance of a competitive bidding process that had been underway up until that point.   The freeze-out of Company B and other potential acquirers was extended by agreement of Essilor and Costa to November 11, 2013, virtually ensuring that no other potential acquirer would be able to re-enter the process after losing nearly a month of critical due diligence time.

54.      On November 6, 2013, Company common stock opened the trading day at $21.04 per share, traded as high as $21.05, and closed at $20.89.   In light of the fact that the Merger Consideration offered by Essilor represented *less than a 3% premium* to that November 6th closing price, the Special Committee instructed Whalen to request a higher price per share from Essilor.

55.      On November 7, 2013, Whalen was informed that Essilor would not be increasing its purchase price above $21.50; which was severely unfavorable to Company shareholders as the Company stock continued its upward trend and traded as high as $21.23 on that same day. Rather than push away from the table and force Essilor to rightfully compensate Company

16

shareholders for their holdings which were growing ever more valuable by the day, the Special Committee gave up its pursuit of maximizing value and agreed to recommend the Merger Agreement and the transactions contemplated thereby (including the Merger) at the price of $21.50 per share to the full Board, *even though this Merger Consideration represented barely a 1% premium over the intraday high on that same day.*

56.     Rather than asking its financial advisor to re-analyze the deal in light of the recent market developments for the Company or allowing an additional 4 days to pass so as to allow the exclusivity period to lapse and then provide an appropriate market check based on the Company's new financial situation, the Board simply gave in to its preferred acquirer, Essilor, and allowed it to take over control of the Company for a premium of mere pennies on the dollar.

57.     While Costa shareholders will be fleeced of their holdings in the Company, Costa's executive officers, including Defendant Whalen, stand to receive a windfall that they would not otherwise enjoy if the Company were to remain a standalone entity.  As illustrated in the chart below, in exchange for pledging their more than 1 million combined shares to the Merger via their signed voting agreements, each executive officer stands to walk away from the Company with consideration far and above that received by Costa shareholders.

### Golden Parachute Compensation

| Named Executive Officer | Cash [1] ($) | Equity [2] ($) | Pension/Non-Qualified Deferred Compensation [3] ($) | Perquisites/Benefits [4] ($) | Tax Reimbursement [5] ($) | Total [6] ($) |
|---|---|---|---|---|---|---|
| David G. Whalen | 3,307,500 | 10,343,318 | — | 48,804 | — | 13,699,622 |
| Kevin F. Mahoney | 676,425 | 2,388,000 | — | 7,308 | — | 3,071,733 |
| Tina C. Benik | 535,500 | — | — | 17,262 | — | 552,762 |
| Charles R. MacDonald | 850,000 | 4,674,341 | — | 17,262 | — | 5,541,603 |
| Charles S. Mellen(7) | — | — | — | — | — | — |

58.     Simply put, the Proposed Transaction is the product of a fundamentally flawed process that is designed to unlawfully divest Costa's public shareholders of their equity holdings in exchange for inadequate Merger Consideration and end the Company's independent existence.

17

Defendants know Costa will continue to produce substantial revenue and earnings for Essilor, yet

have engaged in a flawed sales process that detrimentally leaves the minority public shareholders

of Costa with less than adequate consideration, guaranteeing that they will not enjoy the future

financial success of the Company they have loyally invested in.  Herein, Plaintiff alleges that the

Proposed Transaction is being accomplished by deception, illegality, and in breach of

Defendants' fiduciary duties.

**C.**      **The Board Enters Into the Merger Agreement for Inadequate Consideration**

59.      On November 8, 2013, Costa issued a press release announcing the Proposed

Transaction, which states, in relevant part, the following:

> Lincoln, RI – November 8, 2013 (GLOBE NEWSWIRE) – Costa Inc. (NASDAQ: ATX) today announced an agreement whereby *Essilor International* will acquire all outstanding shares of the company for $21.50 per share. This corresponds to an enterprise value of approximately $270 million. The all-cash offer represents a 19% premium on the volume weighted average share price over the past six months and approximately 2.8x the last twelve month's revenue from continuing operations. The merger agreement provides that Costa Inc. may consider superior proposals from other interested parties. Previously known as A.T. Cross, Costa Inc. designs, assembles and markets sunglasses under the Costa® and Native® eyewear brands.

> Introduced in 1983, when a few fishermen decided the world needed better sunglasses, Costa has become a leader in the performance sunglass market. As a premiere manufacturer of superior polarized performance sunglasses, Costa is best known for its patented 580 lens technology, which offers color enhancement and increased visual acuity. Still handcrafted today in Florida, Costa's unparalleled fit and durability, backed by a lifetime warranty, have made them a leading choice of serious water sports enthusiasts.

> Costa is also known for its commitment to protecting the world's waters and works with conservation partners around the world to help increase awareness and influence policy so that both the fish and fishermen of tomorrow will have healthy waters to enjoy.

> Commenting on the agreement, David G. Whalen, Chief Executive Officer of Costa Inc. said, "When viewed in comparison with comparable transactions we believe that this transaction represents significant value to our shareholders." Mr. Whalen continued, "We are delighted to be joining forces with the world leader in

optics. Over the past decade, as the terrific Costa management team has worked to make customers and consumers more aware of the features and benefits offered by the Costa brand, our business has grown rapidly. As a member of the Essilor family, we will have access to a deep pool of world class resources including technology and distribution that will drive our continued growth both in the United States and the global marketplace."

Under the terms of the merger agreement, certain Costa shareholders owning in the aggregate approximately 34% of the outstanding common shares of Costa have agreed to vote in favor of the transaction at a forthcoming special meeting to be called to approve it, subject to certain conditions. Additionally, a termination fee of approximately $8.9 million is payable, under certain circumstances, by Costa Inc. to Essilor in the event a superior, unsolicited offer is accepted by Costa Inc.

The transaction is expected to close in early 2014, subject to necessary regulatory approvals and clearances, approval by the Costa shareholders, and certain other conditions. The transaction is not subject to any financing contingency and it will be financed out of Essilor's cash reserves.

60.     The consideration offered to Costa public stockholders in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of Costa's common shares are materially in excess of the consideration being offered in the Proposed Transaction given the Company's prospects for future growth and earnings.  The Board has breached their fiduciary duties to Costa stockholders by failing to take steps to obtain the best price possible under the circumstances before entering into this transaction pursuant to which Essilor is underpaying for Costas shares, thus unlawfully harming Costa stockholders.

61.     Given Costa's recent strong performance as well as its future growth prospects, the consideration shareholders will receive is inadequate and undervalues the Company.  While shareholders are expected to collect a 7% premium on the closing price, this transaction premium is significantly below the rapid growth rate of its stock.

62.     In fact, in just the previous year, the Company's stock price had increased by an astronomical 135% as demonstrated in the chart below:



63.    Since the announcement of the Proposed Transaction, the Company's share price has been consistently trading above the $21.50 consideration.  As recently as December 10, 2013, the Company's shares traded as high as $22.00 per share, 2.32% higher than the value that shareholders are expected to receive from the Proposed Transaction.    This premium is indicative of the market's displeasure with the Proposed Transaction and the widespread belief that it undervalues the Company.

64.    Remarkably, according to *Yahoo! Finance*, Costa's own financial advisor, D.A. Davidson & Co. ("Davidson") has set a price target for Costa stock at $29.00 per share, the same advisor that also opined to the Company that $21.50 was a fair price.

65.    Based on the Third Quarter 2013 financial results, Costa's revenue increased 25% year to year, and its Earnings Before Interest, Taxation, Depreciation, and Amortization (EBITDA) at an even greater 50% rate over the same period, propelled by the shift in business focus.  Yet, despite this impressive growth, the Individual Defendants have determined to sell the

Company for a valuation that is well below the current trading multiples of comparable consumer apparel companies.

66.     The Essilor bid values the Company at approximately 17x Enterprise Value (EV)/EBITDA.  This valuation represents a deep discount, particularly when compared to the comparable Acquisition transaction of American sunglasses manufacturer Oakley by Luxottica Group in 2007.  In that deal, Luxottica valued Oakley with an 18.8x multiple, nearly two turns higher than the valuation assigned by Essilor to Costa.

67.     Additionally, the valuation fails to account for the disproportionate effect that costs related to being a public company have on the EBITDA of a small company like Costa.

68.     These failures, among others, are well-known in the investment community, as Dr. Hugh Akston, an analyst for the financial website *Seeking Alpha* published an analysis of the Proposed Transaction on November 11, 2013 highlighting the "paltry premium" and inadequate consideration.

69.     Dr. Akston was not alone in his displeasure with the valuation, as equity analysts The Benchmark Company, LLC ("Benchmark") have also issued a research report casting doubt on the fairness of the valuation and reaffirming their price target of $27 per share.  Notably, Benchmark took issue with the EBITDA multiple used to value the Company:

> The deal values Costa at approximately 13x our 2013 EBITDA estimate, or 12.5x our 2014 EBITDA estimate.  This valuation appears low as we believe a typical accessory company trades for 12x EBITDA.  Our peer group valuation is trading at 14x 2013 EBITDA and 12x 2014 EBITDA, with Luxottica trading at 18x 2013 EBITDA and 14x 2014 EBITDA.  Given Costa's growth opportunities, we believe a higher premium would be warranted.  We believe over the next couple years, Costa Inc. with a focus primarily on the performance eyewear could continue to expand demographically and geographically, improve its door growth, continue to penetrate the prescription market, and drive innovative technology which could lead to years of earnings growth. Given the solid balance sheet, boosted by the cash from the sale of the accessory division, strong cash flow, profitability, and management's proven execution, we believe a higher premium to the acquisition price would be warranted.

70.     In addition, the Proposed Transaction consideration fails to adequately compensate Costa's shareholders for the significant synergies created by the merger.  In the November 8, 2013 press release announcing the Proposed Transaction, Defendant Whalen recognized the potential synergies, stating that:

> We are delighted to be joining forces with the world leader in optics. Over the past decade, as the terrific Costa management team has worked to make customers and consumers more aware of the features and benefits offered by the Costa brand, our business has grown rapidly. As a member of the Essilor family, we will have access to a deep pool of world class resources including technology and distribution that will drive our continued growth both in the United States and the global marketplace.

71.     In a statement on the Proposed Transaction, Hubert Sagnières, Essilor's Chairman and Chief Executive Officer said, "[t]he high quality sunglasses and prescription sun lens segment offers high potential given its low penetration rate."

72.     Yet, despite the significant synergies and current and future profit inherent in the transaction for Essilor being obvious to the acquirer, the Individual Defendants failed to secure a fair price for the Company, either for the intrinsic value of its assets or the value of the Company's assets to Essilor.  Accordingly, the Proposed Transaction consideration is inadequate and grossly undervalues the Company.

73.     Moreover, the Proposed Transaction appears purposely timed to forestall a surge in the Company's share price, as it was announced just days after the Company's promising third quarter 2013 results.  The timing of the Proposed Transaction eliminates the market's ability to respond to the glowing quarterly results.  As such, it appears that the proposed offer price provides an insufficient premium to shareholders.

**D.** **The Unreasonable Deal Protection Devices**

74.    On November 8, 2013, the Company filed a Form 8-K with the SEC wherein it disclosed the terms of the Merger Agreement.  To the detriment of Costa stockholders, as part of the Merger Agreement, the Individual Defendants agreed to certain deal protection devices that operate conjunctively to lock-up the Proposed Transaction and ensure that no competing offers will emerge for the Company.

75.    First, the Merger Agreement contains a strict "no-solicitation" provision prohibiting the Company or the Individual Defendants from taking any affirmative action to comply with their fiduciary duties to obtain the best price possible under the circumstances. Pointedly, the Merger Agreement at section 6.1 requires that the Company and the Individual Defendants shall not,

> directly or indirectly: (i) solicit, initiate, propose, knowingly encourage or knowingly take any other action to facilitate any inquiries or the making of any proposal or offer that constitutes, or could reasonably be expected to lead to, any Acquisition Proposal, including (A) approving any transaction under Section 7-5.2-4 of the Rhode Island Business Combination Act, (B) approving any person becoming an "interested shareholder" under Section 7-5.2-4 of the Rhode Island Business Combination Act and (C) amending or granting any waiver or release under any standstill or similar agreement with respect to any Company Common Shares (except for any portion of any such standstill or similar agreement that restricts the ability of a person to privately communicate an Acquisition Proposal to the Company, the Company Board or any committee thereof); or (ii) enter into, continue or otherwise participate in any communications, discussions or negotiations regarding, furnish to any person any information or data with respect to, knowingly assist or participate in any effort or attempt by any person with respect to, or otherwise knowingly cooperate in any way with, any Acquisition Proposal

76.    Similarly, sections 6.1(a) and 6.1(b) of the Merger Agreement provide for "information right" and "matching right" provisions pursuant to which the Company must promptly notify Essilor within forty-eight (48) hours should it receive an unsolicited competing

Acquisition Proposal. The Company must notify Essilor of the bidder's identity and the terms of the bidder's offer. Thereafter, if the Board determines that the competing acquisition proposal constitutes a "Superior Proposal," section 6.1(b) requires the Board to grant Essilor four (4) business days to amend the terms of the Merger Agreement to make a counter-offer that the Company must consider in determining whether the competing bid still constitutes a "Superior Proposal."

77.     The effect of these provisions is to prevent the Board from entering discussions or negotiations with other potential purchasers unless the Board can first determine that the competing acquisition proposal is, in fact, "superior," and even then, the Company must give Essilor an opportunity to match the competing takeover proposal. Consequently, this provision prevents the Individual Defendants from exercising their fiduciary duties and precludes an opportunity for a potential purchaser to emerge.

78.     Additionally, the Merger Agreement provides that Costa must pay to Essilor a termination fee of $8.9 million pursuant to section 8.3 in the event the Company decides to pursue any competing offer. This unreasonable termination fee will ensure that no competing offer will appear, as any competing bidder would essentially pay a naked premium for the right to provide the stockholders with a superior offer.

79.     Moreover, in connection with the Proposed Transaction, Defendants Whalen and Boss, along with certain Costa executive officers and members of their families and other affiliates, who collectively own approximately 100% of Class B common stock and approximately 34% of the outstanding Class A and Class B common shares, have entered into voting agreements to vote in favor of the Proposed Transaction with Essilor and against any third

party acquisition proposal. Accordingly, 100% of Costa's Class B stock and 34% of all of Costa's common stock is already "locked up" in favor of the Proposed Transaction.

80. Ultimately, these deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a "Superior Proposal" are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

81. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

E.    **The Materially Misleading And/Or Incomplete Proxy**

82. In order to secure shareholder approval of this unfair deal, Costa and the Individual Defendants filed with the SEC a materially misleading and incomplete Proxy. On December 9, 2013, the Company filed its Proxy with the SEC in connection with the Proposed Transaction. Compounding the defective sales process utilized by the Individual Defendants, the Proxy fails to provide the Company's stockholders with material information thereby precluding the stockholders from making a fully informed decision regarding the upcoming vote on the Proposed Transaction.

83. The Proxy fails to address the misstatements and omissions raised by Plaintiff herein. Specifically, the Proxy omits/or misrepresents the material information set forth below in contravention to Sections 14(a) and 20(a) of the Exchange Act, rendering shareholders unable to cast an informed vote on the Proposed Transaction.

84. The omitted information described herein, if and when disclosed, would

significantly alter the totality of information available for consideration by the average Costa shareholder. As such, if Costa shareholders vote based upon the inadequate Proxy they will be irreparably harmed.

85.     In particular, the Proxy fails to disclose certain financial projections for Costa provided by management to Davidson for the years 2013E through 2017E for the following items: (i) anticipated synergies from the Proposed Transaction, (ii) capital expenditures and (iii) net operating loss carryforwards ("NOLs"). In addition to these financial metrics the Proxy also fails to make important distinctions from the financial projections that are disclosed. For instance, the Proxy fails to distinguish debt, pension liabilities and compensation liabilities from other current and long-term liabilities.

86.     The disclosure of financial projections are material in this instance because they (i) provide shareholders with a basis to better project the future financial performance of the Company in making their approval decision and (ii) help shareholders better understand the financial analyses provided by the Company's financial advisor in its fairness opinion. Without such information, Costa's shareholders will be forced to decide whether to vote their shares in favor of the Proposed Transactions or whether to seek appraisal of their shares without all material information necessary to make an informed decision.

87.     Specifically, as set forth in more detail below, the Proxy filed by the Company also fails to disclose underlying methodologies, key inputs and multiples relied upon and observed by Davidson. This information is necessary for shareholders to evaluate and properly assess the credibility of the various analyses preferred by Davidson and relied upon by the Board in recommending the Proposed Transaction to Costa shareholders. In describing the analyses performed by Davidson, the Proxy fails to disclose the following:

indicated enterprise values.

88.     Also, the *Background of the Merger* section of the Proxy contains the following material omissions:

(a)     The basis for retaining Davidson as the Company's financial advisor to evaluate the Proposed Transaction and the extent and nature of business for which the Company has previously engaged Davidson and the amount of fees paid to Davidson related thereto;

(b)     Whether the Board conducted a conflict check on Davidson before they were formally engaged;

(c)     The amount of fees previously paid to Davidson during the two-year period preceding Davidson's retention relating to the Proposed Transaction;

(d)     Whether Costa interviewed and/or considered financial advisors other than Davidson in connection with the Proposed Transaction;

(e)     The terms of the confidentiality/standstill agreement executed between Essilor and Costa;

(f)     A description of the "potential transactions and business combinations, as well as A.T. Cross' standalone business plans and prospects";

(g)     A description of the "strategic alternatives " that the Company explored for its Cross Accessory Division ("CAD") as announced on February 4, 2013;

(h)     The Board's rationale for deciding to "inform the Chairman of Company A that he should not send a written expression of Company A's interest at this time."

(i)     The Board's rationale for concluding that a "sale of CAD and COG together would not be likely to result in maximum value for A.T. Cross and its shareholders";

28

      (j)     Why COG's adjusted EBITDA for 2013 was reduced from $20.4 million to $20.0 million (page 28 of the Registration Statement ¶6);

      (k)     Explain the difference between EBIDTA and EBITDA;

      (l)     The price-per-share equivalent of Company C's proposal;

      (m)     The identities of Companies A – G that were interested in acquiring Costa;

      (n)     The rationale as to why the Board sent a response to Essilor that stated "that the $21.00 price per share in Essilor's indication of interest undervalued Costa . . .";

      (o)     Whether Whalen or any of the members of the Board or senior management discussed future employment with Essilor any time before the announcement of the Proposed Transaction;

      (p)     Whether the Board, at any time prior to entering into the Proposed Transaction, considered any other strategic alternatives; and

      (q)     Whether any potential bidders or acquirers for Costa refused to enter into a non-disclosure agreement and/or refused to enter into further negotiations with the Company because of the existence of any standstill provision or agreement.

      89.     The information requested above is necessary for one to be able to evaluate and understand the sales process and analysis rendered in connection with the Proposed Transaction. Therefore, the aforementioned omitted information is highly relevant and material to Costa shareholders.

      90.     Accordingly, because the foregoing material misstatements and omissions represent a violation of federal law, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that he will suffer absent judicial intervention.

## COUNT I

**On Behalf of Plaintiff for Violations of Section 14(a) of the Exchange Act
Against the Individual Defendants and Costa**

91.     Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

92.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein, except for paragraphs 31-32.

93.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.

94.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

95.     Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render it non-misleading.

96.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT II

### On Behalf of Plaintiff for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants and Costa

97.     Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

98.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein, except for paragraphs 31-32.

99.     The Individual Defendants acted as controlling persons of Costa within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Costa, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

100.    Each of the Individual Defendants and Costa were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

101.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

102.   Costa also had direct supervisory control over the composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy. Costa, in fact, disseminated the Proxy and is, thus, directly responsible for materially misleading shareholders because it permitted the materially misleading Proxy to be published to shareholders.

103.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants and Costa were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants and Costa participated in drafting and/or gave their input on the content of those descriptions.

104.   By virtue of the foregoing, the Individual Defendants and Costa have violated Section 20(a) of the Exchange Act.

105.   As set forth above, the Individual Defendants and Costa had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT III

### On Behalf of Plaintiff and the Class for Breach of Fiduciary Duties Against the Individual Defendants

106.   Plaintiff repeats and realleges paragraphs 1-90 set forth herein.

107.   The Individual Defendants have violated fiduciary duties of care, loyalty, candor and good faith owed to public shareholders of Costa.

108.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Costa.

109.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Costa because, among other reasons, they failed to take steps to obtain adequate value of Costa to its public shareholders and constituents and to fully advise Costa shareholders of the material information they need to cast a fully-informed vote.  The Individual Defendants dominate and control the business and corporate affairs of Costa, and are in possession of private corporate information concerning Costa's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Costa which makes it inherently unfair for them to benefit their own interests to the exclusion of obtaining adequate shareholder and constituent value.

110.     Moreover, the Individual Defendants have failed to fully disclose to Plaintiff and the Class all material information necessary to make an informed decision regarding the Proposed Transaction.

111.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

112.     As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the

value of Costa's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

113.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

114.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

**COUNT IV**

**On Behalf of Plaintiff and the Class**
**Against Costa, Essilor, and Merger Sub for**
**Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty**

115.    Plaintiff incorporates by reference and realleges paragraphs 1-90 and 106-114 contained above, as though fully set forth herein.

116.    Costa and Essilor and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Costa's public shareholders, and have participated in such breaches of fiduciary duties.

117.    Costa and Essilor and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, these defendants rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties by inter alia, agreeing to the unreasonable deal protection devices in order to protect their interests in the Proposed Transaction.

118.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants as follows:

A.      Declaring that this action is properly maintainable as a Class action with regards to the claims arising under state law and certifying Plaintiff as Class representative;

B.      Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company makes full and complete disclosure of all materials facts necessary to enable shareholders to cast an informed vote on the Proposed Transaction;

C.      Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for shareholders;

D.      Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

E.      Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated:  December 13, 2013

/s/ Barry J. Kusinitz
Barry J. Kusinitz, Esq. #1404
155 South Main Street, Suite 405
Providence, RI 02903
Tel: (401) 831-4200
Fax: (401) 831-7053
Email: bkusinitz@bdglawyers.com

*Counsel for Plaintiff*

**OF COUNSEL:**
**FARUQI & FARUQI, LLP**
Juan E. Monteverde
369 Lexington Avenue, 10th Fl.
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331